**UNITED BUSINESS COMMUNICATIONS, INC., Plaintiff,**

v.

**RACAL–MILGO, INC., Defendant.**

**Civ. A. No. 80–2051.**

United States District Court,
D. Kansas.

July 24, 1984.

Carter H. Kokjer, Kokjer, Kircher, Bradley, Wharton, Bowman & Johnson, William H. Curtis, Michael C. Manning, Morrison, Hecker, Curtis, Kuder & Parrish, Kansas City, Mo., John F. Dodd, Shawnee Mission, Kan., Robert D. Benham, McAnany, Van Cleave & Phillips, Kansas City, Kan., for plaintiff.

J. Donald Lysaught, Weeks, Thomas & Lysaught, Kansas City, Kan., William Prickett, James L. Holzman, Michael Hanrahan, Prickett, Jones, Elliott, Kristol & Schnee, Wilmington, Del., Allen Kirkpatrick, Larry S. Nixon, William T. Bullinger, Cushman, Darby & Cushman, Washington, D.C., for defendant.

## MEMORANDUM AND ORDER

O'CONNOR, Chief Judge.

This case, an action for relief from a prior judgment entered by this court because of fraud on the court, is now before us on the motion of the plaintiff, United

Business Communications, Inc. ("UBC"), for summary judgment against the defendant, Racal-Milgo, Inc. ("Milgo"). In light of the extensive memoranda and voluminous supporting documentation filed by the parties, the court deems oral argument unnecessary. *See* Local Rule 15(d). Before addressing the merits of UBC's motion, however, we will attempt to relate the background of this lawsuit.

### Background

In July of 1971, Milgo brought suit against UBC and others for infringement of three patents for electronic devices held by Milgo. *Milgo Electronic Corporation v. United Telecommunications, Inc. and United Business Communications, Inc.,* No. KC–3380 (hereinafter referred to as "KC–3380" or "the prior Kansas lawsuit"). In KC–3380, Milgo claimed that certain modems [1] sold by UBC infringed one or more of the following patents: Whang United States Letters Patent No. 3,524,023 ("Whang '023"); Ragsdale United States Letters Patent No. 3,590,381 ("Ragsdale '381"); and Ragsdale and Payne United States Letters Patent No. 3,643,023 ("Payne '023"). This court, Honorable George Templar, District Judge, determined that each of the three patents represented a significant and non-obvious improvement over prior art in the electronics field and, therefore, that each patent was valid and was infringed by UBC. *Milgo Electronic Corp. v. United Telecommunications, Inc.,* 189 U.S.P.Q. 160 (D.Kan. 1976). The court subsequently determined that UBC had wilfully and deliberately infringed the patents by copying a Milgo modem, *Milgo Electronic Corp. v. United Telecommunications, Inc.,* 200 U.S.P.Q. 481 (D.Kan.1978), and that Milgo was enti-

tled to judgment (including treble damages) in the amount of $2,340,726.23, *Milgo Electronic Corp. v. United Telecommunications, Inc.,* 200 U.S.P.Q. 639, 640 (D.Kan. 1978). The judgment of this court was affirmed on appeal. *Milgo Electronics Corp. v. United Business Communications, Inc.,* 623 F.2d 645 (10th Cir.1980). Since the trial in KC–3380, however, the patents involved in that lawsuit have been the subject of other lawsuits elsewhere, and additional information has come to light that casts some doubt upon the correctness of this court's prior judgment.

The validity of the Whang '023 patent was again at issue in a lawsuit filed in 1976 in the United States District Court for the District of Massachusetts. *Codex Corp. v. Milgo Electronic Corp.,* 534 F.Supp. 418 *("Codex")*. In that lawsuit, the plaintiff sought to have the Whang '023 patent declared invalid and unenforceable against them because, *inter alia,* Milgo had misused the patent and was guilty of "unclean hands" as a result of its conduct in the Kansas lawsuit, KC–3380. The *Codex* court, after reviewing the conduct of Milgo in KC–3380, held that the Whang '023 patent was invalid and unenforceable. *Codex Corp. v. Milgo Electronic Corp.,* 534 F.Supp. 418 (D.Mass.1982), *aff'd,* 717 F.2d 622 (1st Cir.1983).

Central to the district court's holding in *Codex* was its finding that Whang, the inventor, and Milgo, the assignee of the patent, had made misrepresentations to this court in KC–3380 concerning the technical specifications contained in the Whang '023 patent and embodied in the Milgo modems.

Whang testified and the [Kansas] court found that the patent covered Mil-

---

**1.** "A modem, considered in this case, is a communication device that allows a computer or information terminal to communicate with another computer or information terminal via ordinary unconditioned voice-grade telephone lines that are used for everyday human voice telephone communication. A data (information) signal from a terminal is converted into an electrical signal which is suitable for telephone line transmission, and at the other end the re-

ceived signal is reconverted back to an original data (information) signal. The signal conversion and reconversion by the modem is accomplished by modulation and demodulation, and the word modem is a contraction (acronym) of *mod* ulator-*dem* odulator [citations to the record omitted]." *Milgo Electronic Corp. v. United Telecommunications, Inc.,* 189 U.S.P.Q. 160, 171 (D.Kan.1976) (Finding of Fact 9).

go models 4600, 4400/24, 4400/48, 24 LSI and 20 LSI. He also testified that the composite filter of all of those modems had cosine roll-off of less than fifty percent. This was untrue, as Whang now admits, except for the 4600 series and the 4400/48. The expert witness for UBC never examined or tested any of the modems, so that Whang's assertion went unchallenged.

. . . .

The court also concluded that a composite filter characteristic of less than fifty percent cosine roll-off was included in the claims. The district judge ruled that an inventor may be his own lexicographer, and that Mr. Whang had written his own specifications without benefit of some of the existing textbooks. Finding 61 states in part:

> 61. ... The Whang invention teaches and claims his composite filter means which, when expressed mathematically in terms of roll-off ..., requires a roll-off of from about 50% roll-off down to the ideal or zero percent roll-off.... The features of a narrow-band composite "filter means" of the Whang '023 patent represent a significant and non-obvious improvement over the wide-bandwidth filters recommended for phase modulated systems.... [189 U.S.P.Q. at 179.]

534 F.Supp. at 427–28.

The *Codex* court concluded that most of the Milgo modem models claimed to be covered by the Whang '023 patent did not have "narrow-skirted filters" (*i.e.* a combined filter rolloff of 50% or less). 534 F.Supp. at 427.

> 4. Milgo's prototype modem, the 4400/24 (or WU 2247), the development of which led to Whang's purported invention, had wide skirts. Subsequent Milgo modems with wide skirts were labeled with the '023 patent number on them.... *I find that the concept of narrow skirts as the novel teaching of the '023 patent to have been devised by Mr. Jones* [Milgo's trial counsel in KC–3380] *and Mr. Whang after the fact, for purposes of*

*establishing the validity of the '023 patent in the Kansas litigation.*

534 F.Supp. at 429–30 (emphasis added). The *Codex* court concluded: "I cannot escape the conclusion that both of these men [Jones and Whang] have deliberately misrepresented the narrow-skirt issue to both the District Court of Kansas and to this court." 534 F.Supp. at 433–34. On appeal, the First Circuit Court of Appeals reached a similar conclusion.

> Whang admitted at trial that the only novel feature to be found in his patent, Whang '023, was "narrow skirts." That is, a roll-off of 50% or less. The other salient features of Whang '023 such as differential phase modulation, limiting the passband to 1/T Hz and center sampling were already known both separately and in combination. We agree with the district court's conclusion that the asserted novelty, a composite filter roll-off of 50% or less, is nowhere to be found in any of claims 1, 19 or 25 either expressly or by implication. Since the asserted novelty does not, in fact, exist there is no invention.

717 F.2d at 626–627.

The validity of the Whang '023 patent was again at issue, along with Ragsdale '381 and Payne '023, in a suit filed in 1978 in the United States District Court for the District of Delaware. *Rixon, Inc. v. Racal-Milgo, Inc.*, 551 F.Supp. 163 ("*Rixon*"). In *Rixon*, the plaintiff sought to have each of the three patents declared invalid and unenforceable.

> According to Rixon, Whang '023 is invalid because it is an old combination of elements already established in the prior art, and it is unenforceable because Whang and Milgo concocted, and successfully urged upon the Kansas Court, a theory of validity they knew to be untrue. Payne '023 is invalid, in Rixon's view, because it is obvious from the prior art; it is unenforceable because Milgo took a position in the Kansas litigation with respect to the scope of the Payne patent which was logically irreconcilable with one it was taking simultaneously in

a foreign patent proceeding. Rixon attacks Ragsdale '381 as invalid because it is anticipated in the prior art, or obvious from it, and unenforceable because Milgo suppressed evidence that it had made a commercial use or sale of the Ragsdale invention more than one year prior to filing the patent application.

*Rixon, Inc. v. Racal-Milgo, Inc.*, 551 F.Supp. 163, 168 (D.Del.1982).

In considering the plaintiff's allegations of misconduct, the *Rixon* court noted that "[t]o establish an unenforceability defense, however, the allegedly infringing party must prove, by clear and convincing evidence, that the patent holder has wrongfully obtained or misused its patent." 551 F.Supp. at 171.

In discussing the alleged unenforceability of the Whang '023 patent, the *Rixon* court made the following relevant findings.

In persuading the Kansas Court that Whang had invented something patentable rather than arrived at an obvious improvement over the prior art, Milgo relied on representations of Whang and other witnesses that the Whang '023 patent taught the use of "sharp skirted" filters. As explained hereafter, Whang, Milgo and its Kansas trial attorney knew at that time that the Whang '023 did not teach "sharp skirted" filters and that the Milgo modems touted as having revolutionized the industry did not have sharp skirts. In its successive effort to sell this "sharp skirt" theory, Milgo deliberately concealed documents and information from its Kansas opponents and the Kansas Court which were needed to fairly assess the patent against the statutory criteria of anticipation and obviousness. 551 F.Supp. at 172.

. . . .

. . . the record shows that the subsequent confirmation of a monopoly in Kansas rested on misinformation provided to the court by Milgo.
551 F.Supp. at 173.

. . . .

The Whang invention, as set forth in the application and the final patent, did not teach anything about the rolloff of the composite filter, by rolloff or any other name.
551 F.Supp. at 174.

. . . .

While I conclude that the evidence of fraud on the Patent Office is not clear and convincing, there can be no doubt that the evidence of fraud on the Kansas Court is accurately so categorized. Whang testified in Kansas that his patent taught the use of filters having 50% rolloff or less. The Kansas Court accepted this statement, and relied upon it as a nonobvious advance over the prior art. [189 U.S.P.Q. at 179, 181 (Findings of Fact 61 and 76)]. *This testimony was false, and Whang and Milgo's trial counsel knew it was false at the time.* Whang also testified that the Milgo 24 LSI and 20 LSI modems, although using more advanced circuitry than the original 4400 modem series, incorporated his sharp rolloff invention. The commercial success of these modems was one of the secondary considerations contributing to the Kansas Court's finding of non-obviousness. [189 U.S.P.Q. at 174 (Finding of Fact 39)]. *This testimony likewise was deliberately false.*

. . . .

In sum, I cannot accept the proposition that Whang '023 communicates narrow rolloff to persons skilled in the relevant engineering art.

The evidence of Whang's own research and development also strongly supports the conclusion that narrow rolloff was not an element of Whang '023. In Kansas, UBC's expert, Dr. Walter Beam, noted that he had not had an opportunity to determine the bandwidth of the modem Milgo built for Western Union which purported to incorporate the Whang invention. If he had done so, UBC would have learned that the original Whang modem, the one built specifically to meet Western Union's "challenge," did not incorporate a composite filter having less than 50% rolloff. This information would also have been disclosed if Milgo had respond-

ed in good faith to UBC's discovery. Milgo did not disclose Whang's filter files to UBC during the Kansas litigation, even though those documents fell within categories of documents which UBC sought by discovery.

551 F.Supp. at 176–177 (emphasis added).

. . . .

*I find the evidence clear and convincing that the June and July demonstration modems used filters which did not have less than 50% rolloff.*

The evidence also shows that Whang subsequently designed narrower filters in an attempt to produce a modem capable of simultaneously transmitting voice and data. [Footnote omitted.] He employed these in the production model 2247 modem delivered to Western Union in March 1967, but this modem did not work successfully and Milgo returned to wider filters for the 175 modems of the 2247 model it sold to Western Union. 551 F.Supp. at 177 (emphasis added).

. . . .

Finally, if more were needed, *Milgo's corporate conduct shows that narrow rolloff filters were no part of the Whang patent.* Milgo marked its 24 and 20 LSI ("large scale integrated [circuit]") modems with the Whang patent designation. But these modems, as Milgo was forced to admit in a letter to the Tenth Circuit Court of Appeals, used filters with wide rolloff.

Despite this corporate recognition of the scope of the Whang '023, when the time subsequently arrived for litigating the validity of the patent in Kansas, Whang specifically testified that these modems used "fifty percent rolloff or less." [Citation omitted.] He did so in response to a specific question posed by Milgo's counsel. *Milgo let the answer stand because it helped to establish a "breakthrough" in modem design built on narrow rolloff filters. And Milgo did more than simply let Whang stand uncorrected.* Its Proposed Finding of Fact 37, which the Kansas Court adopted verbatim, stated:

37. Subsequent introduction of additional modem series by Milgo (Models 4600, 3300, 2200, 24/LSI and 20/LSI) as well as the 4400 series embody the claimed invention of the patents in suit. (Citations to record omitted). The patented Milgo modems are today sold on a worldwide basis. In less than a decade from its entry into the modem market, Milgo/ICC has emerged as one of the acknowledged leaders of the independent modem manufacturers. The growth of Milgo is attributable to the patented modems. . . .

This finding of commercial success is of the sort endorsed in *Graham v. John Deere, Co.*, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966) as secondary evidence of a non-obvious invention. As such, it was material to the Kansas Court's application of the statutory criteria, and Milgo's misrepresentations made it impossible for the Kansas Court to apply those criteria correctly to the issue before it.

551 F.Supp. at 178 (emphasis added).

Thus, the *Rixon* court found clear and convincing evidence that Milgo had misrepresented both the contents of the Whang patent and its commercial success to this court in KC–3380.

In considering the alleged unenforceability of the Payne '023 patent, the *Rixon* court noted that Milgo had successfully persuaded this court in KC–3380 that the continuously running counter in the digital storage register described in the Payne '023 was a non-obvious improvement over prior art and was the equivalent of the reset counter of the Rixon DS–2400.

While the Kansas defendants may have failed to make a case for file wrapper estoppel based on representations made in the United States Patent Office, there was considerable ammunition for an estoppel argument based upon the file history of the German equivalent patent. Siemons cited a United States patent to Secretan, No. 3,020,485, as prior art against the Payne device. The Secretan patent covered a detector in a much slow-

er modem which computed the signal phase by integrating over an entire modulation interval, rather than by sampling at the center of the baud. Despite these differences, however, it used digital circuits to perform much the same function as the Payne '023.

Milgo first learned about Secretan in 1973. Siemons cited Secretan in the German Patent Office in February 1975, six months before the Kansas liability trial. In Kansas, Ragsdale told the Court that the Payne '023 "was the first original digital detector." [Citation omitted.] Ragsdale had seen Secretan and discussed it with Milgo's counsel before the trial, and must therefore have known that Secretan's digital system predated Payne's.... But in its proposed Finding of Fact No. 34, Milgo told the Kansas Court that Payne was the first detector using digital circuitry.

Shortly after trial, and before Milgo submitted its post trial proposed Findings of Fact, Milgo distinguished the Payne detector from Secretan in the German patent prosecution by pointing out that Secretan used a reset counter, rather than the register and adder circuits of Payne. This admission that the Payne detector did not read on "reset" devices such as Secretan, if it had been disclosed to the Kansas Court, might well have convinced that Court that the DS–2400 reset counter was not within the range of equivalents to the Payne '023 system.

Milgo argues that it did disclose Secretan to counsel for UBC. The argument is disingenuous at best. The Secretan patent was among those cited on a list of 116 patents which Milgo's counsel sent to UBC's attorney before trial. In response to this submission, UBC asked Milgo to specify which of the 116 patents its trial lawyers had reviewed. Milgo responded with a list of ten patents, which did not include Secretan. As a result, UBC's trial counsel never focused on the Secretan patent during the Kansas litigation.

Moreover, Milgo's disclosure argument misses the point. *The problem here is far more serious than a failure to pro-*

*vide opposing counsel with a pertinent prior art reference. If only that were involved, Rixon's unenforceability argument would clearly be insufficient.* When Milgo was seeking to obtain monopoly rights, it suited its interests to define its invention as excluding DS–2400 [reset counter] type devices, and it did so. Almost simultaneously, however, in attempting to prove infringement in a court, Milgo adopted exactly the opposite position. Courts have repeatedly held in a file wrapper estoppel context, as well as in non-patent contexts, that one may not be permitted to play "fast and loose" with the courts in this manner. *Scarano v. Central R. Co. New Jersey*, 203 F.2d 510, 513 (3d Cir.1953). Having taken the position it did in the German patent office proceeding, Milgo, at least in the absence of disclosure of that fact, was precluded from urging upon the Kansas Court an inconsistent infringement theory.

Milgo thus comes to this Court with "unclean hands." ... Milgo should simply be foreclosed from asserting infringement on a theory which reads the Payne '023 to include DS–2400 type devices. [Footnote omitted.]

551 F.Supp. at 178–79 (emphasis added). Thus, the *Rixon* court concluded that Milgo had played "fast and loose" with this court in KC–3380 by urging a position inconsistent with its position in the German patent proceeding and by obscuring from this court and UBC relevant prior art.

In considering the alleged unenforceability of the Ragsdale '381 patent, the *Rixon* court addressed Milgo's conduct with regard to prior art.

Even after the development of the Whang modem ... Milgo engineers continued to experiment. Whang met with a group of Milgo designers, including Robert Ragsdale, and reported to them on an article by the Russian Telecommunications Administration which explained how to phase lock a stable high frequency oscillator to an incoming carrier signal to improve the quality of differential sig-

1180

nal detection. Following the discussion with Whang, Ragsdale set out to develop a "coherent" detector for the Milgo modem.
551 F.Supp. at 179–180.

. . . .

Milgo did not reveal the Russian article, and its influence on Ragsdale's creative process, in Kansas, although it had acknowledged the article in its own contribution to the CCIT in April 1968. Instead, Ragsdale claimed for his own the improved signal to noise performance of coherent detection. In its proposed Findings of Fact in Kansas, Milgo touted:

47. The Payne '023 patent led Ragsdale to the development of the Ragsdale '381 digital coherent detection patent. [Citations omitted.] The digital detector of the Ragsdale '381 patent accomplished phase locking of two signals of different frequencies in a restricted bandwidth modem in spite of the presence of repeated phase shifts as acknowledged by the defendant's expert Dr. Beam. [Citations omitted.] Originally, Dr. Beam asserted that the Kawai patent [citation omitted] and the Lender patent [citation omitted] showed the method of deriving a reference carrier for coherent detection. However, Dr. Beam finally admitted that phase locking two such sinusoidal signals of different frequencies was a difficult task, [citation omitted], and further admitted that he knew of no prior art that did what Ragsdale did in the '381 patent and that included all the technical things that Dr. Beam could think of. Defendant's own technical expert admitted that the Ragsdale '381 patent distinguishes over the prior art he was aware of, and the claimed features of the Ragsdale '381 patent represents significant and non-obvious improvements over all prior art known by Defendant's technical expert.

The Kansas Court adopted this Finding verbatim. [189 U.S.P.Q. at 179 (Finding of Fact 63).]

. . . .

But neither Dr. Beam, UBC's expert, nor the Kansas Court knew about the Russian article. Unlike the Puente patent, on which the Kansas defendants relied, which disclosed phase locking two signals of the same frequency to one another, the Russian article, in contrast, illustrated phase locking signals in precisely the frequency relationship necessary to give Ragsdale's coherent phase detection.

Ragsdale admitted in this Court that he did not originate the use of amplitude modulation to retain the carrier signal in the presence of repeated phase shifts. Since neither phase locking coherent detection, nor the use of amplitude modulation to preserve the carrier were Ragsdale's invention, neither afforded a basis of patentability.

Although the evidence shows that persons holding responsible positions at Milgo, including Whang and Bleckner, Milgo's president, were aware of the Milgo CCIT contribution, which in turn cited the Russian article, Milgo did not disclose this article to the Kansas Court, or to the Patent Office. Nor did Milgo present Ragsdale '381 as a patentable combination of old elements. Rather, *Milgo relied upon a feature known in the prior art, and which Milgo knew to be old, to persuade the Kansas Court of patentability. Whether Ragsdale's combination was or was not patentable, it was not what Milgo held it out to be. Once again the problem is not limited to Milgo's having withheld a possibly pertinent prior art eference. It deliberately undertook to convince the Kansas Court of something it knew was untrue. Milgo was guilty, not merely of withholding valuable information, but of fabricating a theory of patentability. The result was that the Kansas Court was unable to make a fair judgment on patentability.*

551 F.Supp. at 180–81 (emphasis added).

The *Rixon* court also concluded that Milgo had concealed from that court evidence

of the existence of a prior commercial sale of a modem embodying the Ragsdale '381 patent, which rendered the invention unpatentable under 35 U.S.C. § 102(b).

... Milgo's documents unequivocally establish that Milgo offered the new detector for commercial sale no later than March 1, 1968, a full two weeks before the critical date.

551 F.Supp. at 182.

. . . .

The evidence shows that Milgo's objective was commercial, not experimental.

This is only the beginning, however. Rixon cannot prove fraud merely by demonstrating a prior use or sale. True, Ragsdale signed an oath certifying that the invention disclosed in his application had not been placed on sale more than a year earlier. But "the mere misstatement of a material fact on the patent application is [not], by itself, sufficient to support a finding of fraud. Fraud requires something more. There must be an affirmative intent to deceive or at least a gross negligence in misrepresenting the truth." *DeLong Corp. v. Raymond Int'l, Inc.*, 622 F.2d 1135, 1146 (3d Cir.1980). *See also In re Coordinated Pretrial Proceedings in Antibiotic Antitrust Actions*, 676 F.2d 51 (3d Cir. 1982). Ragsdale's factually incorrect oath does not prove fraud. Regrettably, in this case there is something more, however.

551 F.Supp. at 183.

The Delaware court then concluded, "clearly and convincingly," that Milgo deliberately and fraudulently concealed documents proving that the Ragsdale '381 was invalid under 35 U.S.C. § 102(b) because it had been incorporated into equipment for commercial sale more than one year prior to the patent application. In light of Milgo's conduct, the *Rixon* court concluded that the Ragsdale '381 patent was wholly unenforceable, that the Payne '023 patent was unenforceable in part, and that Milgo was entitled to affirmative relief with respect to the Whang '023 patent. 551 F.Supp. at 185. The opinion of the court in *Rixon* was not followed by an entry of judgment. The parties dismissed their respective claims and counterclaims with prejudice. No appeal was taken. Judge Stapleton, however, refused to grant Milgo's request that he withdraw the opinion.

### The Present Lawsuit

UBC filed the present lawsuit in 1980, seeking relief from the judgment in KC–3380 on the grounds that Milgo committed fraud upon the court. On June 11, 1981, we stayed proceedings pending a decision by the Delaware court in *Rixon*, because we noted that "the same allegations made here by UBC [were] being raised in *Rixon*." (Order, 6/11/81.) The stay was lifted following termination of the *Rixon* lawsuit. (See Memorandum and Order, 5/11/83.)

UBC now seeks summary judgment on the grounds that the findings of the *Rixon* and *Codex* courts that Milgo committed misconduct before this court in KC–3380, are entitled to preclusive effect herein under the doctrine of collateral estoppel and cannot be controverted by Milgo. Thus, UBC seeks to use the doctrine of collateral estoppel offensively to preclude the defendant, Milgo, from relitigating issues determined by the Massachusetts court in *Codex* and the Delaware court in *Rixon*. If the findings of those courts are afforded preclusive effect here, UBC contends, there would remain no genuine issues of material fact regarding Milgo's misconduct in KC–3380, fraud on the court would be established, and UBC would be entitled to summary judgment as a matter of law.

Milgo opposes summary judgment on several grounds. First, Milgo contends that summary judgment is not proper here because many of the factual issues, such as Milgo's scienter, remain controverted. Second, Milgo maintains that in light of the judgment in KC–3380, the doctrine of *res judicata* precludes UBC from relitigating matters relating to that lawsuit and from using collateral estoppel as an offensive weapon herein. Third, Milgo contends that UBC cannot satisfy the requirements for

invoking the doctrine of collateral estoppel. Fourth, Milgo argues that UBC's lack of diligence in investigating and defending KC–3380 prohibit UBC from obtaining any relief from the judgment in KC–3380, based on a theory of fraud on the court. We will address each of Milgo's arguments in turn.

Milgo contends that summary judgment is not proper herein because many of the facts relied on by UBC to support its claim of fraud on the court are controverted. Milgo contends that summary judgment is especially inappropriate here, because Milgo's intent to defraud is an issue. Milgo also points out that in considering a motion for summary judgment, the court must construe the record in Milgo's favor, must resolve inferences in Milgo's favor, and cannot grant summary judgment unless UBC can demonstrate its entitlement thereto beyond a reasonable doubt.

■ This court is, of course, well-acquainted with the standards governing motions for summary judgment. Summary judgment may be granted only if "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The Tenth Circuit has noted that the relief offered by Rule 56 is "drastic, and should be applied with caution." *Machinery Center, Inc. v. Anchor National Life Ins. Co.*, 434 F.2d 1, 6 (10th Cir. 1970). Therefore, the court must view the record in the light most favorable to the non-moving party. *Lindley v. Amoco Production Co.*, 639 F.2d 671 (10th Cir.1980). Furthermore, before summary judgment may be granted, the moving party must establish its entitlement to summary judgment beyond a reasonable doubt. *Madison v. Deseret Livestock Co.*, 574 F.2d 1027, 1037 (10th Cir.1978); *Mustang Fuel Corp. v. Youngstown Sheet & Tube Co.*, 516 F.2d 33, 36 (10th Cir.1975). Summary judgment should not be granted if circumstantial evidence or factual inferences tend to establish genuine issues for trial. *Barber v. General Electric Co.*, 648 F.2d 1272 (10th Cir.1981). Consequently, summary judg-

ment must be granted with caution in cases where questions of intent are involved. *See Romero v. Union Pacific Railroad*, 615 F.2d 1303, 1309 (10th Cir.1980).

■ We note, also, that under the Federal Rules of Civil Procedure, the doctrine of collateral estoppel may be invoked by means of a motion for summary judgment. Fed.R.Civ.P. 56; *Crutsinger v. Hess*, 408 F.Supp. 548, 555 (D.Kan.1976). *See also Lester v. National Broadcasting Co.*, 217 F.2d 399 (9th Cir.1954). "[A] motion for summary judgment may be properly sustained if, with respect to the evidentiary matters conclusively established by a valid plea of collateral estoppel, the court finds that no genuine issue of material fact remains to be determined and that the moving party is entitled to judgment as a matter of law." *Crutsinger v. Hess*, 408 F.Supp. at 555. Therefore, UBC would be entitled to summary judgment if the findings of the *Rixon* and *Codex* courts are entitled to preclusive effect because of collateral estoppel, and if those findings establish that there is no genuine issue as to any material fact and that Milgo committed fraud upon this court in KC–3380 beyond a reasonable doubt.

Second, Milgo has invoked the doctrine of *res judicata* and claims that the prior judgment in KC–3380 bars UBC from bringing its claims in the present lawsuit. Milgo apparently contends that UBC's claim of fraud on the court cannot be raised herein because it was or could have been litigated in KC–3380.

■ We believe that Milgo's claim of *res judicata* is wholly without merit. As UBC correctly points out: "Milgo's reliance on *res judicata* assumes the validity of the Kansas judgment [KC–3380] and thereby begs the real issue before the Court." (UBC's Reply Brief, Dk. #45, at 5.) The essence of UBC's claims herein is that Milgo committed fraud upon this court in obtaining the judgment in KC–3380. Because fraud "vitiates whatever it touches," *Stegman v. Professional & Business Men's Life Ins. Co.*, 173 Kan. 744, 751, 252 P.2d 1074 (1953), and because fraud has been

alleged herein, we are reluctant to apply *res judicata* based upon the judgment in KC–3380. "[A] decision produced by fraud on the court is not in essence a decision at all." *Kenner v. Commissioner of Internal Revenue*, 387 F.2d 689, 691 (7th Cir. 1968), *cert. denied*, 393 U.S. 841, 89 S.Ct. 121, 21 L.Ed.2d 112. Federal courts have long recognized fraud on the court as an exception to the doctrine of finality of judgments. *See, e.g., Hazel-Atlas Co. v. Hartford Co.*, 322 U.S. 238, 244, 64 S.Ct. 997, 1000, 88 L.Ed. 1250 (1943). It would defile the equitable foundations of the doctrine of *res judicata* to suggest that a fraudulently obtained judgment must be entitled to preclusive effect in the very court where the fraud was perpetrated, and thereby prevent litigation of the fraud issue.

Third, Milgo argues that UBC has not established the requisite elements of collateral estoppel. Specifically, Milgo argues that the issues involved in the present case are not identical to those in the *Codex* and *Rixon* cases, that the opinion of the United States District Court for the District of Delaware was not "final" for purposes of collateral estoppel, and that UBC should not be entitled to utilize offensive collateral estoppel because it sat on the sidelines instead of joining in the *Codex* and *Rixon* cases.

 Under the doctrine of collateral estoppel, also known as the doctrine of issue preclusion, an actual and necessary determination of an issue by a court of competent jurisdiction is conclusive in a subsequent case based on a different cause of action, but involving a party to the prior litigation. *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326, n. 5, 99 S.Ct. 645, 649, n. 5, 58 L.Ed.2d 552 (1979). Thus, two clearly-established prerequisites to the application of collateral estoppel are that the issue litigated in the earlier case must be identical and that the party against whom the prior decision is asserted must have had a full and fair opportunity to litigate the issue. *See Montana v. United States*, 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979); *Blonder-Tongue Laboratories,*

*Inc. v. University of Illinois Foundation*, 402 U.S. 313, 328–329, 91 S.Ct. 1434, 1442–43, 28 L.Ed.2d 788 (1971). The doctrine may be applied even though the party asserting it was not a party in the prior case. *Parklane Hosiery Co. v. Shore, supra; Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation, supra.* Moreover, a litigant who is not a party to the prior case may use collateral estoppel "offensively" in a new lawsuit against the party who lost on the decided issue in the prior case. *Parklane Hosiery Co. v. Shore, supra.* An exception to the availability of collateral estoppel as an offensive weapon exists when the party invoking collateral estoppel "could easily have joined in the earlier action." *Parklane Hosiery Co. v. Shore*, 439 U.S. at 322–323, 99 S.Ct. at 645–647, Syl. ¶ 1(b).

Milgo maintains that the issues involved in the present lawsuit are not identical to those considered by the *Codex* and *Rixon* courts and, therefore, were not actually litigated before those courts. Milgo's contention is based upon its observation that the ultimate issue before the *Codex* and *Rixon* courts was the validity and enforceability of the patents, whereas the ultimate issue now before this court is whether Milgo committed fraud on the court in KC–3380. Under Milgo's analysis, therefore, the question of fraud on the court was not actually litigated before the *Codex* and *Rixon* courts, and Milgo has never had a full and fair opportunity to litigate that issue.

 Although Milgo might be correct with regard to differences between the ultimate issues involved in this lawsuit and those in the prior cases, we believe that the underlying issue of Milgo's misconduct in KC–3380 considered by the *Codex* and *Rixon* courts is identical to the issue of misconduct raised herein, and, consequently, that Milgo had a full and fair opportunity to litigate the issue of its misconduct before those other courts. In *Codex*, the plaintiffs sought to have the Whang '023 patent declared unenforceable on the basis of Milgo's misuse and unclean hands in

KC–3380. Judge Skinner obviously considered Milgo's misconduct in declining to afford preclusive effect to the decision of this court in KC–3380. The issue of Milgo's misconduct was, thus, necessary and essential to the Massachusetts court's finding that the Whang '023 patent was invalid and unenforceable.

In *Rixon*, the plaintiff expressly sought to have the Whang '023, the Payne '023, and the Ragsdale '381 declared invalid because of evidence of prior art withheld from the Kansas court, and declared unenforceable because of Milgo's misconduct in "concocting" and urging upon the court false theories of patentability. In finding each of those patents unenforceable, Judge Stapleton clearly and necessarily decided the issue of Milgo's misconduct in KC–3380.

The opinions in both of these cases, and in *Rixon* in particular, leave no room for doubt that the issue of Milgo's misconduct in KC–3380 was squarely raised, and that the parties had ample opportunity to present evidence and arguments on that issue. In fact, the *Rixon* court even went so far as to characterize Milgo's misconduct as fraud on the court. 551 F.Supp. at 176. In any event, the misconduct considered by the *Codex* and *Rixon* courts is the same misconduct raised by UBC in the present lawsuit. Thus, the factual issues are clearly identical.

Thus, even assuming that the *Codex* and *Rixon* courts did not address the ultimate question of fraud on the court under the Tenth Circuit's standard, their findings as to the underlying factual issues of misconduct are identical to those raised here. Thus, it cannot be said that Milgo did not have a full and fair opportunity to litigate those issues before the *Codex* and *Rixon* courts. We will later address Milgo's contention that the findings of those courts do not establish the existence of fraud on the court.

Milgo also contends that the opinion of the United States District Court for the District of Delaware in *Rixon* was merely tentative and interlocutory and cannot,

therefore, constitute a final judgment for purposes of collateral estoppel. As we noted previously, Judge Stapleton's opinion was never reduced to judgment, and the *Rixon* lawsuit was dismissed by stipulation of the parties prior to the entry of judgment or the taking of an appeal. Milgo has seized upon certain statements made by Judge Stapleton in the *Rixon* opinion, 551 F.Supp. 163, and in a July 6, 1982 letter to counsel in that case. Milgo interprets these statements as concessions on Judge Stapleton's part that his opinion was merely preliminary and tentative. We cannot agree. After carefully reviewing Judge Stapleton's language in his opinion and in his letter to counsel, we find no indication that he regarded his findings concerning Milgo's misconduct as in any way tentative or preliminary. Rather, his uncertainty, if any, appears to concern the implications of the misconduct. We note, also, that Judge Stapleton refused to withdraw his opinion, although requested to do so by Milgo's counsel.

We now consider whether the absence of a formal judgment and an appeal in *Rixon* preclude application of collateral estoppel. It has been observed that the requirement of finality in the prior action "is applied less rigidly to issue preclusion than to claim preclusion," and that "[f]or purposes of issue preclusion, a final judgment includes any prior adjudication of an issue in another action that is 'determined to be sufficiently firm to be accorded conclusive effect.'" C. Wright, *Law of Federal Courts* § 100A, at 682 (4th ed. 1983). Because the opportunity for appeal was waived by Milgo as a result of its decision to stipulate to the dismissal of the *Rixon* case, we do not believe that the absence of appellate review is a relevant consideration here.

Similarly, we do not believe that the absence of a formal judgment embodying the opinion of the court regarding a central issue in a complex lawsuit should necessarily preclude application of collateral estoppel. "Finality" for purposes of collateral estoppel means merely that the is-

sue has been fully litigated. *Chemetron Corp. v. Business Funds, Inc.*, 682 F.2d 1149, 1191 (5th Cir.1982), *vacated on other grounds and remanded*, 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983); *Miller Brewing Co. v. Joseph Schlitz Brewing Co.*, 605 F.2d 990, 996 (7th Cir.1979), *cert. denied*, 444 U.S. 1102, 100 S.Ct. 1067, 62 L.Ed.2d 787 (1980); *Zdanok v. Glidden Co., Durkee Famous Food Division*, 327 F.2d 944, 955 (2d Cir.), *cert. denied*, 377 U.S. 934, 84 S.Ct. 1338, 12 L.Ed.2d 298 (1964). *See, also Aetna Casualty & Surety Co. v. Jeppesen & Co.*, 440 F.Supp. 391 (D.Nev.1977), *vacated on other grounds and remanded*, 642 F.2d 339 (9th Cir.1981). It appears that Judge Stapleton's findings on the issue of Milgo's misconduct were final in all respects except the entry of a judgment. Under Fed.R.Civ.P. 54(b), judgment could have been entered upon the issue of Milgo's misconduct "only upon an express determination that there [was] no just reason for delay" in entering judgment on that issue. We have no doubt that the issue of Milgo's misconduct was fully litigated. Accordingly, we conclude that the opinion of the court in *Rixon* was "final" for purposes of collateral estoppel.

■■■ Milgo also contends that UBC should not be entitled to invoke collateral estoppel offensively because it chose to "sit on the sidelines" during the *Codex* and *Rixon* lawsuits, although it could have easily joined in both of those lawsuits. Milgo correctly cites *Parklane Hosiery v. Shore*, *supra*, for the proposition that a party cannot adopt a "wait and see" position with regard to the prior lawsuit, and then later use the decision in the prior lawsuit as the basis for offensive collateral estoppel. In Milgo's view, UBC could have joined in the *Codex* and *Rixon* cases but chose not to, so that it would not be bound by any adverse decisions in those cases. Under Milgo's analysis, therefore, it would be unfair to permit UBC to invoke collateral estoppel based on those cases.

■■■ We cannot agree that UBC could easily have joined in either the *Codex* or *Rixon* lawsuits. During the pendency

of both of those cases, UBC was (and remains) subject to a judgment obtained in this court, in favor of Milgo and against UBC on the grounds that UBC had wilfully infringed upon valid and enforceable patents held by Milgo. UBC's only recourse, therefore, was to take the action that it has taken in this lawsuit: to seek relief from the judgment in the court where the judgment was entered. The Massachusetts and Delaware courts lacked the power to set aside or grant other relief from a judgment based on fraud on another court. *See* 7 J. Moore, *Moore's Federal Practice* ¶ 60.33, n. 16 (2d ed. 1983). In light of the prior judgment in KC–3380, therefore, UBC could raise its claim of fraud on the court only in the court where the allegedly fraudulent judgment was obtained—the United States District Court for the District of Kansas. Because joining in the *Codex* or *Rixon* lawsuits would have been futile, we cannot say that it would be unfair to permit UBC to invoke collateral estoppel based on the decisions in those cases.

We conclude that UBC is entitled to invoke the doctrine of collateral estoppel in an offensive manner, and that Milgo is collaterally estopped from denying the validity of the relevant findings by the *Codex* and *Rixon* courts. Because we find that Milgo cannot deny the validity of the prior findings concerning its acts of misconduct before this court in KC–3380, those findings cannot be controverted here. Accordingly, there remain no issues as to those facts.

In addition, UBC has established the existence of another uncontroverted fact. During discovery in KC–3380, Milgo stated in response to defendants' second set of interrogatories, that the equipment incorporating the Ragsdale '381 patent was not offered for sale or sold before April 1, 1968. (Plaintiff's Answers to Defendants' Second Set of Interrogatories, No. 52.) As the *Rixon* court determined, however, Milgo had, in fact, made a commercial sale of Ragsdale '381 on or before March 1, 1968, which was more than one year prior to the application for patent.

There remains the question whether the uncontroverted facts are sufficient to prove fraud on the court.

In addition to disputing the findings of the courts in *Codex* and *Rixon* and their applicability here, Milgo denies that the misconduct found by those courts is sufficient to constitute fraud on this court. Milgo argues that fraud on the court is limited to only the most egregious misconduct affecting the impartiality of the court, such as bribery of a judge or fraud by an officer of the court. [Citing *Great Coastal Express, Inc. v. International Brotherhood of Teamsters*, 675 F.2d 1349 (4th Cir.1982), *cert. denied*, 459 U.S. 1128, 103 S.Ct. 764, 74 L.Ed.2d 978 (1983); *Wilkin v. Sunbeam Corp.*, 466 F.2d 714 (10th Cir.1972); *United States v. International Telephone and Telegraph*, 349 F.Supp. 22 (D.Conn.1972), *aff'd sub nom.*, *Nader v. United States*, 410 U.S. 919, 93 S.Ct. 1363, 35 L.Ed.2d 582 (1973).] Further, Milgo has directed the court's attention to a recent Tenth Circuit opinion in which that court stated:

> Fraud on the court ... is fraud which is directed to the judicial machinery itself and is not fraud between the parties or fraudulent documents, false statements or perjury. It has been held that allegations of nondisclosure in pre-trial discovery will not support an action for fraud on the court.
>
> *Bulloch v. United States*, 721 F.2d 713, 718 (10th Cir.1983).

Thus, according to Milgo, the acts of misconduct found by the *Codex* and *Rixon* courts do not rise to the level of fraud on the court.

UBC, on the other hand, contends that Milgo's conduct constitutes fraud on the court in light of the standards applied by the United States Supreme Court in another patent infringement suit, *Hazel-Atlas Co. v. Hartford Co.*, 322 U.S. 238, 64 S.Ct. 997, 88 L.Ed. 1250 (1943). Milgo maintains that *Hazel-Atlas* is distinguishable.

The court has reviewed the cases relied upon by the parties. Rather than producing a clear standard, however, the cited authorities indicate that the question of fraud on the court must turn upon the facts of each case. Fraud on the court "is a nebulous concept." *Wilkin v. Sunbeam Corp.*, 466 F.2d at 717. The controlling factors appear to be whether the misconduct tampers with the judicial machinery and subverts the integrity of the court itself. *See Hazel-Atlas, supra; Wilkin, supra;* 7 J. Moore, *supra,* ¶ 60.33, at 360. For the reasons that follow, we believe the facts of Milgo's misconduct fall within the range of conduct proscribed by the Supreme Court in *Hazel-Atlas.*

In *Hazel-Atlas Co. v. Hartford Co.*, Hartford obtained and enforced a patent on a glass-molding machine with the aid of an article written by its attorneys and officials, and published under the name of a supposedly disinterested expert. Although it had not been determined that the judgment was the product of the fraud, the Supreme Court assumed that the concocted article constituted a fraud on the court and ordered that the judgment be set aside and the case dismissed.

> [T]ampering with the administration of justice in the manner indisputably shown here involves far more than an injury to a single litigant. It is a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society.... The public welfare demands that the agencies of public justice be not so impotent that they must always be mute and helpless victims of deception and fraud.

322 U.S. at 246, 64 S.Ct. at 1001.

The Court concluded:

> The total effect of all this fraud, practiced both on the Patent Office and the courts, calls for nothing less than a complete denial of relief to Hartford for the claimed infringement of the patent thereby procured and enforced.
>
> *Id.* at 250, 64 S.Ct. at 1003.

Milgo argues that *Hazel-Atlas* is not applicable here, primarily because the fraud committed in that patent case was

qualitatively different from that in KC–3380. We are not persuaded by Milgo's attempts to distinguish *Hazel-Atlas* from the case at bar. If the presentation of falsified evidence of patentability constitutes fraud on the court, then so too does the fabrication of theories of patentability and the presentation to the court of things known to be untrue.

Although many of Milgo's acts of misconduct, if viewed in isolation, would not rise to the level of fraud on the court, the same cannot be said when the acts are viewed together in the context of a single lawsuit. Milgo's conduct in KC–3380 did not involve a single isolated instance of perjury, misrepresentation, nondisclosure, or withholding of information. Instead, Milgo's acts and omissions in KC–3380 show a *pattern* of misconduct clearly aimed at preventing the court from making a fair and well-informed assessment of the validity and enforceability of the three patents. We believe that when there is a pattern of false testimony, fabrication, and nondisclosure of relevant information in a systematic effort to mislead a court, the type of corrective action described in *Hazel-Atlas* must be applied.

We cannot escape the conclusion that Milgo, in KC–3380, deliberately undertook to convince this court of things it knew were untrue, and to otherwise prevent the court from making a fair and well-informed decision. The uncontroverted facts establish clearly and convincingly that Milgo presented false and misleading testimony, withheld relevant information concerning prior art, failed to respond in good faith to discovery requests, submitted a false statement in answer to interrogatories, and fabricated theories of patentability. We believe that Milgo "tamper[ed] with the administration of justice" in KC–3380, and that the fraud caused injury to the public interest, as well as to UBC. "There are great issues of moment to the public in a patent suit." *Hazel-Atlas*, 322 U.S. at 246, 64 S.Ct. at 1001. *See, also, Precision Instrument Manufacturing Co. v. Automotive Machinery Co.*, 324 U.S. 806, 65 S.Ct.

993, 89 L.Ed. 1381 (1945). We conclude, as did the Supreme Court in *Hazel-Atlas*, that

[t]his is not simply a case of a judgment obtained with the aid of a witness who, on the basis of after-acquired evidence is believed possibly to have been guilty of perjury. Here ... we find a deliberately planned and carefully executed scheme to defraud [a court].

322 U.S. at 245, 64 S.Ct. at 1000.

We must therefore conclude that Milgo committed fraud upon this court in KC–3380.

Moreover, unlike the fraud in *Hazel-Atlas*, the fraud in KC–3380 clearly influenced the court's decision on the validity and enforceability of the three patents, as is evidenced by the court's verbatim adoption of many of Milgo's proposed findings and conclusions. In short, we have no doubt that were Judge Templar still on active status and sitting in the present lawsuit, he would not hesitate to vacate his prior judgment in order to prevent Milgo from reaping the benefit of its fraud.

As a final argument in opposition to summary judgment on the basis of fraud on the court, Milgo contends that UBC should be precluded from obtaining relief from the judgment in KC–3380 because of its own lack of diligence in defending that lawsuit. Milgo contends that UBC could and should have discovered each piece of relevant information and each of the alleged fraudulent acts in time to raise them in that lawsuit.

In *Hazel-Atlas*, the Supreme Court considered and rejected a similar argument in light of the substantial public interest involved in the patent system. That same public interest is present here. Although UBC certainly could have exercised greater diligence in investigating the validity of the patent claims, we simply cannot condone Milgo's conduct before this court by permitting it to benefit from a judgment rendered by a court it had actively deceived. UBC's prior lack of diligence will be taken into account in determining the appropriate disposition of this lawsuit.

We conclude that the prior judgment of this court in KC–3380, in the amount of $2,340,726.23 should be set aside. Milgo will be required to refund that amount, plus interest, to UBC. In light of UBC's apparent lack of diligence in KC–3380, and the willfulness with which it copied an ostensibly patented product, however, we do not believe that UBC is entitled to reimbursement of its attorney's fees and costs in KC–3380 or in this lawsuit.

We note that Milgo's counterclaim remains before the court. Judgment will be entered upon disposition of all the claims. Fed.R.Civ.P. 54(b).